Slip Op. 18-101

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| HYUNDAI HEAVY INDUSTRIES, CO. LTD., | |
| Plaintiff, | |
| v. | Before: Mark A. Barnett, Judge |
| UNITED STATES, | Court No. 17-00054 |
| Defendant, | **PUBLIC VERSION** |
| and | |
| ABB INC., | |
| Defendant-Intervenor. | |

<u>OPINION</u>

[Remanding the U.S. Department of Commerce's decision to use total facts available with an adverse inference.]

Dated: August 14, 2018

<u>David E. Bond</u>, White and Case LLP, of Washington, DC, argued for Plaintiff.  With him on the brief were <u>William J. Moran</u> and <u>Ron Kendler</u>.

<u>John J. Todor</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With him on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Franklin E. White, Jr.</u>, Assistant Director.  Of counsel on the brief was <u>Christopher Hyner</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

<u>R. Alan Luberda</u>, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenor.  With him on the brief were <u>David C. Smith</u> and <u>Melissa M. Brewer</u>.

Barnett, Judge:  Plaintiff, Hyundai Heavy Industries, Co., Ltd. ("Plaintiff" or "HHI")

contests the final results of the U.S. Department of Commerce ("Commerce" or the

"agency") in the third administrative review ("AR 3") of the antidumping duty order

covering large power transformers ("LPTs") from the Republic of Korea for the period of

review August 1, 2014, through July 31, 2015.  *Large Power Transformers from the*

*Republic of Korea*, 82 Fed. Reg. 13,432 (Mar. 13, 2017) (final results of antidumping

duty administrative review; 2014-2015) ("*Final Results*"), ECF No. 17-2, and

accompanying Issues and Decision Mem., A-580-867 (Mar. 6, 2017) ("I&D Mem."), ECF

No. 17-3.[1]

## BACKGROUND

Commerce initiated AR 3 on October 6, 2015.  *Initiation of Antidumping and*

*Countervailing Duty Admin. Reviews*, 80 Fed. Reg. 60,356, 60,358 (Dep't Commerce

Oct. 6, 2015), CJA Vol. I Tab 5, PJA Vol. I Tab 5, PR 10, ECF No. 40-1.  Commerce

selected HHI and Hyosung Corporation as mandatory respondents.  I&D Mem. at 3.

Commerce issued its initial questionnaire to HHI on December 3, 2015.  *See* Req. for

Information – Antidumping Admin. Review (Dec. 3, 2015) ("Initial Questionnaire"), CJA

Vol. I Tab 6, PJA Vol. I Tab 6, PR 21, ECF No. 40-1.[2]  Commerce published its

preliminary results of review on September 2, 2016.  *Large Power Transformers from*

---

[1] The administrative record for this case is divided into a Public Administrative Record ("PR"), ECF No. 17-4, and a Confidential Administrative Record ("CR"), ECF No. 17-5. Parties submitted joint appendices containing record documents cited in their briefs. *See* Public J.A. ("PJA"), ECF No. 44 (Vols. I-III); Confidential J.A. ("CJA"), ECF Nos. 40-1 (Vol. I), 41-1 (Vol. II), 42-1 (Vol. III), 43-1 (Vol. IV), 45-1 (Vol. V), 46-1 (Vol. VI), 46-2 (Vol. VII).  References are to the confidential versions of the relevant record documents, unless stated otherwise.

[2] Commerce issued supplemental questionnaires to HHI both before and after it published the preliminary results.  Further discussion of the supplemental questionnaires and HHI's responses to them is contained in the relevant section of the analysis, *infra*.

*the Republic of Korea*, 81 Fed. Reg. 60,672 (Dep't Commerce Sept. 2, 2016) (prelim.

results of antidumping duty administrative review*; 2014-2015)* ("*Preliminary Results*").

For the *Preliminary Results*, Commerce relied on HHI's submitted data and calculated a

weighted-average dumping margin of 3.09 percent for HHI.  *Id.*, 81 Fed. Reg. at 60,673.

Commerce published the *Final Results* on March 13, 2017.  *Final Results*, 82

Fed. Reg. 13,432.  For the *Final Results*, Commerce assigned to HHI a final weighted-

average dumping margin of 60.81 percent based on total facts available with an

adverse inference (referred to as total adverse facts available).  *Id.*, 82 Fed. Reg. at

13,432.  Commerce's decision to rely on total adverse facts available was based on four

findings: (1) HHI failed to report service-related revenues separately from the gross unit

price despite repeated requests from Commerce, I&D Mem. at 21-22; (2) HHI failed to

include the price of a subject "part" in the price for certain home-market sales despite

repeated opportunities to do so, *id.* at 23-26; (3) HHI failed to report separately the

prices and costs for accessories, *id.* at 26-27; and, (4) HHI was systematically selective

in providing various documents to Commerce and Commerce determined there were

discrepancies in HHI's reported data, *id.* at 27-28.

HHI now challenges Commerce's decision to rely on total adverse facts available

and each of the four rationales that the agency cited as supporting that decision.  The

court must determine whether Commerce's individual findings are supported by

substantial evidence and whether the agency's resort to total adverse facts available is

otherwise in accordance with law.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii).[3]  The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

### LEGAL FRAMEWORK FOR ADVERSE FACTS AVAILABLE

When "necessary information is not available on the record," or an interested party "withholds information" requested by Commerce," "fails to provide" requested information by the submission deadlines, "significantly impedes a proceeding," or provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i), Commerce "shall . . . use the facts otherwise available."  19 U.S.C. § 1677e(a). Commerce's authority to use the facts otherwise available is subject to 19 U.S.C. § 1677m(d).  *Id.*  Pursuant to § 1677m(d), if Commerce determines that a respondent has not complied with a request for information, it must promptly inform that respondent of the nature of the deficiency and, to the extent practicable in light of statutory deadlines, provide that respondent "an opportunity to remedy or explain the deficiency." *Id.* § 1677m(d).

---

[3] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the United States Code are to the 2012 edition.  Citations to 19 U.S.C. § 1677e, however, are to the United States Code 2016 edition, which reflects amendments to § 1677e pursuant to the Trade Preferences Extension Act ("TPEA"), Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015). The TPEA amendments affect all antidumping determinations made on or after August 6, 2015, and, therefore, apply to the instant proceeding. *See* Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793 (Dep't Commerce Aug. 6, 2015).

Commerce may not disregard information that is "necessary to the determination but does not meet all the applicable requirements," when:

(1) the information is submitted by the deadline established for its submission,
(2) the information can be verified,
(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
(4) the interested party has demonstrated that it acted to the best of its ability in providing the information . . ., and
(5) the information can be used without undue difficulties.

*Id.* § 1677m(e).

If, however, Commerce determines that the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." *Id.* § 1677e(b). "Compliance with the 'best of its ability' standard is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).[4]

Commerce uses total adverse facts available when "none of the reported data is reliable or usable," such as when all of the "submitted data exhibit[s] pervasive and persistent deficiencies that cut across all aspects of the data." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (citing *Steel Authority of India, Ltd. v. United States*, 25 CIT 482, 487, 149 F. Supp. 2d 921, 928-29 (2001)).

---

[4] *Nippon Steel* predates the amendments made to 19 U.S.C. § 1677e by the TPEA; however, the relevant statutory language discussed in that case remains unchanged. *Compare* 19 U.S.C. § 1677e(b)(2012), *with* 19 U.S.C. § 1677e(b)(1)(2016).

DISCUSSION

## I.   Service-related revenue

### a.  Relevant Facts

In Sections B and C of the initial questionnaire, Commerce instructed HHI to

"report revenue in separate fields (e.g., ocean freight revenue, inland freight revenue, oil

revenue, installation, etc.) and identify the related expense(s) for each revenue."  Initial

Questionnaire at JA100059.  In response, HHI stated:

> [HHI] has reported, since the first administrative review, separate revenue
> and expenses whe[n] the customer issues a separate purchase order for
> services that are not part of the original term of sale . . .  [HHI] has
> reported the sales amount from additional purchase orders in the
> ADDPOPRU field and the associated additional expenses under the
> separate purchase order in the ADDPOEXPU field.  [HHI] did not receive
> additional purchase orders for home-market sales during the POR . . . ."

Resp. of Hyundai Heavy Industries Co., Ltd. to Section B of the Questionnaire (Jan. 27,

2016) ("HHI's Sec. B Resp.") at B-4, CJA Vol. I Tab 8, CR 152-156, PJA Vol. I Tab 8,

PR 91-94, ECF No. 40-1; *see also* Resp. of Hyundai Heavy Industries Co., Ltd. to

Section C of the Questionnaire (Jan. 27, 2016) ("HHI's Sec. C Resp.") at C-3, CJA Vol. I

Tab 9, CR 152-156, PJA Vol. I Tab 9, PR 91-94, ECF No. 40-1 (cross-referencing its

response to Section B of the questionnaire).  HHI explained that its reporting

methodology was based on Commerce's "conclusion" in the original investigation:

> [Commerce] found that [HHI] correctly had reported its gross unit price
> and properly did not separate, for example, freight where there were no
> 'separate arrangements on behalf of the customer' and where [HHI] had
> not 'sought reimbursement for that cost.' . . . [Commerce] recognized that
> its practice is to separate revenue and expenses 'that are not included in
> the term of sale.'

HHI's Sec. B Resp. at B-3 (citing Issues and Decision Mem., A-580-867 (Jul. 11, 2012) ("Initial Investigation I&D Mem.") at Comment 4, accompanying *Large Power Transformers from the Republic of Korea*, 77 Fed. Reg. 40,857 (Dep't Commerce July 11, 2012) (final determination of sales at less than fair value).  HHI reasoned that the prices of its services are not separable from the price of the subject merchandise.  *See id.* at B-4 ("[W]he[n] it is required, installation and supervision are not separable from the LPT itself.").  HHI's response asserted that Commerce has distinguished "separately provided and charged services from those within the terms of sale" in prior proceedings. *Id.* at B-3 (citing Issues and Decision Mem., A-100-001 (Aug. 31, 2009) at Comment 12, accompanying *Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom*, 74 Fed. Reg. 44,819 (Dep't Commerce Aug. 31, 2009) (final results of antidumping duty admin. reviews and revocation of an order in part).

Following this initial response, Commerce asked HHI to "clarify whether HHI or Hyundai USA received revenue related to international freight, inland freight, oil, installation, or any other expenses on U.S. sales.  If so, please report this revenue in a field separate from the related expense."  Suppl. Questionnaire for Hyundai Heavy Industries Co., Ltd., and Hyundai Corp. USA's Questionnaire Resps. (July 27, 2016) ("July 27, 2016 Suppl. Questionnaire") at 7, CJA Vol. I Tab 13, CR 266, PJA Vol. I Tab 13, PR 169, ECF No. 40-1.  HHI responded in two parts.  In the first part, HHI stated: "In accordance with [Commerce's] review and treatment of [HHI's] sales documentation in prior segments of this proceeding, [HHI] did not receive separate revenue related to international freight, inland freight, oil, installation, or any other expenses on home-

market sales or U.S. sales." *See* Resp. to the Second Suppl. Sections A, B, C and D

Questionnaire (Aug. 10, 2016) ("HHI's Aug. 10, 2016 Suppl. Resp."), at 11, CJA Vol. I

Tab 14, CR 299-313, PJA Vol. I Tab 14, PR 179-179, ECF No. 40-1.  HHI further

indicated that it reported its service revenues in accordance with Commerce's

conclusions in prior reviews.  *See id.* at 11-12 ("In those instances whe[n HHI] received

a purchase order for a separate service, [HHI] reported the sales revenue and

corresponding expenses separately in accordance with [Commerce's] requirements[.]").

In the second part of its response, HHI included Attachment 2S-17, which

Commerce found to be relevant to HHI's revenue reporting.  *See* Resp. to Questions 8,

16, 25, 26 and 28 of the Second Suppl. Sections A, B, C and D Questionnaire (Aug. 18,

2016) ("HHI's Aug. 18, 2016 Suppl. Resp."), Attach 2S-17, CJA Vol. I Tab 15, CR 300-

313, PJA Vol. I Tab 15, PR 189-190, ECF No. 40-1.  Attachment 2S-17 included sales

documentation that contained separate service line-items with a corresponding price,

and those price amounts were higher than the expenses that HHI reported in its sales

database.  *See* I&D Mem. at 20 & nn.105-106 (citing HHI's Aug. 18, 2016 Suppl. Resp.,

Attach 2S-17; HHI's Aug. 18, 2016 Suppl. Resp., Attach 2S-26, CJA Vol. VI Tab 4, CR

299-315, PJA Vol. II Tab 4, PR 189-190, ECF No. 46-1).

Commerce sent a second supplemental questionnaire to HHI after it issued the

*Preliminary Results*.  *See* Suppl. Questionnaire for Hyundai Heavy Industries Co., Ltd.,

and Hyundai Corp. USA's Questionnaire Resps. (Oct. 7, 2016) ("Oct. 7, 2016 Suppl.

Questionnaire"), CJA Vol. I Tab 16, CR 346, PJA Vol. I Tab 16, PR 213, ECF No. 40-1.

Therein, Commerce cited ABB Inc.'s ("ABB") argument that HHI had received service-

related revenue, and instructed HHI to report such expenses and revenues:

> "In its September 13, 2016 comments, Petitioner asserts [that] HHI
> incurred expenses and obtained revenues for separately-negotiated
> services and non-subject merchandise for [certain][5] sales. . . . Please
> revise your U.S. sales database to report all such expenses and revenues
> for these sales in separate fields."

*Id.* at 6.  Commerce also stated: "If, in your opinion, there were no additional expenses

or revenues related to a sale, please comment on each of the items cited by the

Petitioner . . . ."  *Id.* at 6.

In its response, HHI addressed the particular sales rather than revising the sales

database.  *See* HHI's Nov. 10, 2016 Suppl. Resp. at 7-8, 11-16.  Relevant to the

service-related revenue issue, HHI explained that although there were separate line

item values for certain services, those values were "not severable from the lump-sum

price."  *Id.* at 7-8. [6]   HHI went on to state that, notwithstanding its "demonstration [] that

HHI did not have any 'separate' revenues for separate services or non-subject

merchandise," HHI was providing "a worksheet listing on a category basis the values

listed anywhere in the sales documentation for the breakdowns of the price of the LPTs

and the corresponding expenses."  *Id.* at 23; *see also id.*, Attach. 3S-46 (the worksheet),

CJA Vol. IV Tab 17, PJA Vol. I Tab 17, ECF No. 43-1.

---

[5] The sales were identified as U.S. sequence numbers ("SEQUs") 11 and 16.  Oct. 7,
2016 Suppl. Questionnaire at 6.  SEQU 11 concerned the issue of separately
negotiated services, whereas SEQU 16 concerned the issue of non-subject
merchandise.  *See* Resp. to Questions 13 and 17 of the Third Suppl. Sections A, B, C,
and D Questionnaire (Nov. 10, 2016) ("HHI's Nov. 10, 2016 Suppl. Resp.") at 7-8, CJA
Vol. II Tab 17, CR 440-449, PJA Vol. I Tab 17, PR 241-250, ECF No. 41-1.
[6] Transportation, offloading, and supervision.  *Id.* at 7-8.

In its *Final Results*, Commerce determined that HHI refused to provide

information requested in the initial and supplemental questionnaires, and therefore,

"impeded [the] review by failing to act to the best of its ability by failing to provide

[Commerce] with the requested information in a timely manner."  I&D Mem. at 22.

Commerce's review of HHI's sales documents identified separate service line items with

corresponding prices, which were higher than HHI's corresponding reported expenses,

supporting Commerce's concern that HHI could be overstating gross unit prices.  *Id.* at

20, 21.  Commerce concluded that, "HHI and its customers separately assigned prices

for the related services and identified these amounts as separate line items on invoices,

separate from the price of the subject merchandise."  *Id.* at 21.  Moreover, Commerce

stated:

> Although these services are required under the terms of sale and are
> invoiced on a lump-sum basis, as [HHI] argued, we find that [HHI's] sales
> documentation specifically indicates that these sales-related services
> could be negotiable, apart from subject merchandise, since each service
> is shown/listed with the corresponding amount in purchase orders and/or
> invoices.  In other words, if customers do not like [HHI]'s price for a certain
> service, they can procure/arrange such service on their own without using
> [HHI]'s service.

*Id.* at 21.  Commerce questioned the reliability of the worksheet provided by HHI, finding

it incomplete because it appeared to be missing certain data fields for multiple U.S.

sales, such as the related expenses for its claimed revenues.  *Id.*  According to

Commerce, if HHI had "followed [Commerce's] request to report separately service-

related revenues and the related expenses early on . . . [the agency] would have had

the time to request additional necessary information (i.e., the missing data) and verify

other issues."  *Id.* at 22.  Commerce also explained that it had "specifically requested

that [HHI] provide this information in the instant review, because [HHI's] sales

documentation identifies separate line items for sales-related services." *Id.* Those

separate line items demonstrated to the agency that the sales-related services could be

negotiable, thereby distinguishing this review from prior segments of this proceeding.

*See id.*

### b.  Parties' Contentions

Plaintiff asserts that Commerce departed from the practice it relied upon in

previous segments of the proceeding for determining whether separate service-related

revenue existed or should have been reported.  *See* Confidential Rule 56.2 Mot. for J.

Upon the Agency R. on Behalf of Pl. Hyundai Heavy Industries Co. Ltd. and Mem. of P.

& A. in Supp. ("Pl.'s Br.") at 24-26, ECF No. 26 (referring to Commerce's application of a

"new test").  Plaintiff contends that in so doing, Commerce failed to provide Plaintiff

sufficient notice of its change in practice.  *See id.* at 24, 29-31.  Plaintiff further contends

that Commerce did not indicate in the supplemental questionnaires that the agency was

changing its approach to service-related revenue or identify a deficiency in HHI's data.

Confidential Am. Reply in Supp. of Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. ("Pl.'s

Reply") at 6-7, ECF No. 38.  HHI also argues that the worksheet submitted with its third

response provided the information necessary to calculate a dumping margin.  *See* Pl.'s

Br. at 31-33.

United States ("Defendant" or the "Government") defends Commerce's

determination on the grounds that "each administrative review is a separate segment of

[the] proceeding[] with its own unique facts."  Confidential Def.'s Resp. to Pl.'s Rule 56.2

Mot. for J. Upon the Agency R. ("Def.'s Resp.") at 16, ECF No. 31 (quoting *Shandong*

*Huarong Mach. Co. v. United States*, 29 CIT 484, 491 (2005)).  According to the

Government, Commerce based its revenue-capping decision in each segment on the

record evidence presented in that individual segment.  *See id.* at 17.  Thus,

notwithstanding the agency's conclusions in prior administrative segments, Commerce

reasonably concluded, based on evidence presented in AR 3, that HHI separately

negotiated the price for service-related expenses.  *See id.* at 18.

ABB argues that Commerce modified its standard antidumping duty

questionnaire at the beginning of the review, instructing HHI to separately report its

service-related revenue.  Confidential Def.-Int.'s Resp. in Opp'n to Pl.'s Mot. for J. on

the Agency R. ("ABB's Resp.") at 6-7, ECF No. 29.  ABB contends that Commerce's

instruction in the supplemental questionnaire "did not limit reporting of revenues in this

review regardless of what it may have done in the prior segments."  *Id.* at 8.  ABB

characterizes Plaintiff's arguments concerning Commerce's alleged use of a new

service-related revenue methodology as a challenge to Commerce's fact-finding

authority.  *See id.* at 22 ("Contrary to HHI's claim, Commerce's right to seek factual

information during a proceeding does not constitute a 'test' from which the agency must

justify a departure.").

### c.  Analysis

Antidumping analysis requires Commerce to compare the export price or

constructed export price of the subject merchandise with the normal value of the foreign

like product.  *See* 19 U.S.C. § 1677b(a); *see also* 19 C.F.R. § 351.401(a).  Section

1677a(c) provides three instances when Commerce shall increase the export price or

constructed export price, and § 1677b(a)(6) provides six instances when Commerce

shall increase the normal value.  *See* 19 U.S.C §§ 1677a(c), 1677b(a)(6).  There is no

statutory basis for increasing the export price, constructed export price, or normal value

when a service is separately provided and the respondent earns a profit on the

provision of that service.  *See Sucocitrico Cutrale Ltda. v. United States*, Slip Op. 12-71,

2012 WL 2317764, at 4 (CIT June 1, 2012) ("Commerce properly determined that it was

inappropriate to treat the [service charges] as adjustments to the U.S. price under

section 1677a(c)" when those charges were not attributable to the subject

merchandise.)  Likewise, there is no statutory language requiring export price,

constructed export price, or normal value to be adjusted downward for any profit made

on the provision of a service when the provision of that service is part of the transaction

for the sale of the subject merchandise.  *See* 19 U.S.C §§ 1677a(c)-(d), 1677b(1)(6)-(7).

Thus, the issue, as framed by Commerce, is whether the gross unit price, as reported

by HHI, properly includes the provision of the services in question or, as determined by

Commerce, those services were separately negotiable, regardless of whether they were

ultimately provided and charged in a single, lump-sum invoice.  *See* I&D Mem. at 21

("[HHI's] sales documentation specifically indicate[d] that these sales-related services

could be negotiable, apart from subject merchandise since each service is shown/listed

with the corresponding amount in purchase orders and/or invoices.").

　　　　When Commerce finds that a service is separately negotiable, its practice has

been to cap the service-related revenue by the associated expenses when determining

the U.S. price.  *Id.* at 18 & n.88 (citations omitted).  This court recently acknowledged

that Commerce's revenue-capping practice was previously examined by the court and

found to be reasonable.  *See ABB, Inc. v. United States*, 41 CIT ___, ___, 273 F. Supp.

3d 1200, 1208-09 (2017) (citing *Dongguan Sunrise Furniture Co., Ltd. v. United States*,

36 CIT ___, ___, 865 F.Supp.2d 1216, 1248 (2012)).  Plaintiff does not challenge

Commerce's capping practice, instead focusing its arguments on the agency's factual

findings.  *See* Pl.'s Br. at 25-31; Pl.'s Reply at 2-6.

Substantial evidence supports Commerce's finding that HHI had separate

service-related revenue to report, but failed to do so.  *See* I&D Mem. at 21.  Although

HHI did not issue separate invoices for these services, the record shows that "HHI and

its customers separately assigned prices for these services and identified these

amounts as separate line items on invoices, separate from the price of the [LPTs]."  I&D

Mem. at 21 & n.112 (citing HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-35);[7] *see also*

*id.* at 20 & n.105 (citing HHI's Aug. 18, 2016 Suppl. Resp., Attach. 2S-17); Pl.'s Br. at 10

(asserting that "its sale documents sometimes showed separate prices for services")

(citations omitted).

Moreover, Commerce's determination that HHI withheld information requested by

the agency and significantly impeded the proceeding is supported by substantial

evidence.  *See* I&D Mem. at 4-5, 21-22.  Commerce's initial questionnaire instructed

HHI to report service-related revenue in separate fields and to identify the related

---

[7] Attachment 3S-35 spans CJA Vol. II Tab 17 at JA 100538, ECF No. 41-1, to CJA Vol.
IV Tab 17 at JA 103841, ECF No. 43-1.

expense for each type of revenue.  Initial Questionnaire at JA100059.  HHI did not

report all separately identifiable revenues as requested, instead reporting separate

revenue and expenses only for services when the customer issued a separate purchase

order because they were not encompassed in the original terms of sale.  *See* HHI's

Sec. B Resp. at B-3; HHI's Sec. C Resp. at C-3.  When Commerce requested Plaintiff to

clarify whether HHI or its U.S. affiliate received revenue related to freight, oil,

installation, or other related expenses on U.S. sales, and, if so, to report this revenue in

a separate field along with the related expense, HHI again responded by providing its

understanding of the terms "separate revenue."  *See* July 27, 2016 Suppl.

Questionnaire at 7; HHI's Aug. 10, 2016 Suppl. Resp. at 11-12.  When Commerce

asked Plaintiff in the subsequent supplemental questionnaire to revise its U.S. sales

database to report expenses and revenues in separate fields, addressing ABB's

assertions of separately-negotiated services, Plaintiff did not revise its database but

rather provided a worksheet purporting to list a breakdown of "the values listed

anywhere in the sales documentation" and the corresponding expenses.  *See* Oct. 7,

2016 Suppl. Questionnaire at 6; HHI's Nov. 10, 2016 Suppl. Resp. at 23.

Thus, Commerce asked HHI on three separate occasions to separately report

service-related revenue.  Twice, HHI did not; and the third time, HHI provided a

worksheet which was not responsive in the form or manner requested by Commerce.

"The focus of [19 U.S.C. 1677e](a) is respondent's failure to provide information. . . .

The mere failure of a respondent to furnish requested information—for any reason—

requires Commerce to resort to other sources of information to complete the factual

record on which it makes its determination." *Nippon Steel*, 337 F.3d at 1381 (emphasis

omitted).

The court must next consider whether Commerce met its obligations, pursuant to

19 U.S.C. § 1677m(d), to notify HHI of deficiencies in its questionnaire responses.

Plaintiff's arguments that Commerce did not provide HHI with sufficiently detailed notice

of deficiencies in its reporting are not persuasive. *See* Pl.'s Br. at 22-23, 32-33. HHI

was informed that its reporting of service-related revenue was deficient because

Commerce made multiple requests for such information, including an explicit request

that HHI revise its sales database to report "all expenses and revenues" in separate

fields.[8] Intentional obtuseness on the part of respondent does not obviate Commerce's

multiple requests to HHI for the relevant information.

Substantial evidence also supports Commerce's decision to apply an adverse

inference, which was otherwise in accordance with law. Commerce "may use an

inference that is adverse to the interests of [a respondent] in selecting from among the

facts otherwise available" when the respondent "fail[s] to cooperate by not acting to the

best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1)(A).

A respondent fails to cooperate by acting to the best of its ability to comply with a

---

[8] While Commerce's instruction included an alternative by which HHI might explain why
it chose not revise its database, this alternative did not excuse HHI from the reporting
burden if Commerce did not accept the explanation and the alternative did not exclude
the risk that Commerce would rely on facts available in the absence of time to make
another request for the information. Plaintiff was required to prepare an "accurate and
complete record in response to questions plainly asked by Commerce." *Tung Mung
Dev. Co., Ltd. v. United States*, 25 CIT 752, 788–89 (2001) (citing *Olympic Adhesives,
Inc. v. United States*, 899 F.2d 1565, 1571–72 (Fed. Cir. 1990)).

request for information when it has not "put forth its maximum effort to provide

Commerce with full and complete answers to all inquiries in an investigation." *Nippon*

*Steel*, 337 F.3d at 1382.

As noted, Commerce made multiple requests for HHI's service-related revenue,

and each time HHI explained that its reporting relied on prior segments of the

proceeding rather than providing the information specific to the current review period as

requested by Commerce.  The fact that the records of prior segments did not support a

conclusion that certain service-related revenues were separately reportable does not

excuse HHI from the burden of again establishing, on the record of this review, that

such revenues were not separately reportable.  As evidenced by the worksheet that HHI

ultimately provided, HHI had the ability to provide substantially more information than it

initially did, but withheld that information until very late in the review.

HHI argues that its failure to comply with the supplemental questionnaires was

informed by, and should be excused by, Commerce's treatment of its service-related

revenues in the original investigation and prior reviews of LPTs.  *See* Pl.'s Br. at 25-26

(citing Initial Investigation I&D Mem. at 29; Issues and Decision Mem., A-580-867 (Mar.

8, 2016) ("AR 2 I&D Mem.") at 39-40, accompanying *Large Power Transformers from*

*the Republic of Korea*, 81 Fed. Reg. 14,087 (Dep't Commerce Mar. 16, 2016) (final

results of antidumping duty admin. review; 2013-2014).  HHI may not, however, rely on

Commerce's factual conclusions from prior reviews in the instant review because each

review is separate and based on the record developed before the agency in the review.

*See, e.g.*, *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1299 (Fed.

Cir. 2014); *Shandong Huarong Mach. Co. v. United States*, 29 CIT 484, 491, (2005)

("[A]s Commerce points out, 'each administrative review is a separate segment of [the]

proceeding[] with its own unique facts. Indeed, if the facts remained the same from

period to period, there would be no need for administrative reviews.'") (citation omitted).

In prior segments of the LPTs from Korea proceeding, Commerce made clear

that its conclusions were based on the record of each segment.  *See* HHI's Aug. 10,

2016 Suppl. Resp. at 11-13 (citing Initial Investigation I&D Mem.; AR 2 I&D Mem.).

Tellingly, on three occasions, HHI quoted language from the prior review and the

original investigation, indicating that Commerce's results were "[b]ased on the record of

the current review," "based upon its review of record evidence," or based on what "the

record . . . suggest[ed]."  *Id.* at 11-13.  The burden to build the record in each segment

lies with the respondent.  *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298

F.3d 1330, 1336 (Fed. Cir. 2002) ("The burden of production [belongs] to the party in

possession of the necessary information.") (quoting *Zenith Elecs. Corp. v. United*

*States,* 988 F.2d 1573, 1583 (Fed. Cir. 1993) (alteration in original).

Substantial evidence further supports a finding that HHI's worksheet failed to

satisfy the elements of 19 U.S.C. § 1677m(e).  As already noted, HHI did not provide

the worksheet allegedly containing the service-related revenue until after the

*Preliminary Results* were issued.  *See* HHI's Nov. 10, 2016 Suppl. Resp. at 23; *see also*

*id.*, Attach. 3S-46 (the worksheet).  At that point, Commerce determined that it could not

verify the worksheet's information and address various other issues concerning the

worksheet at such a late stage of the review.  *See* I&D Mem. at 22 & n.15 (citing

Petitioner's Case Br. (Jan. 5, 2017) at 20-22, CJA Vol. VI Tab 9, CR 463-65, PR 280-281, ECF No. 46-1).  Further, Commerce also noted that the worksheet was "incomplete" in that it was "missing information for multiple U.S. sales," casting "serious doubt on the reliability of such information."  *Id.* at 21.  These findings are confirmed by the worksheet itself.  See HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-46.  Thus, substantial evidence supports Commerce's finding that HHI failed to satisfy the elements of 19 U.S.C. § 1677m(e).

For the foregoing reasons, Commerce's findings that HHI had service-related revenues, and that HHI failed to report service-related revenues separately from the gross unit price despite repeated requests from Commerce, are supported by substantial evidence.

## II.    HHI's Treatment of a Certain LPT "Part"

### a.  Relevant Facts

The scope of the antidumping duty order covers both complete and incomplete LPTs.  In its initial questionnaire, Commerce repeated the text of the scope, including the definition of incomplete LPTs as "subassemblies consisting of the active part and any other parts attached to, imported with or invoiced with the active parts of LPTs." Initial Questionnaire at JA100062.  Commerce instructed Plaintiff to "report the price and cost for 'spare parts' and 'accessories' to ensure that product matches are based on accurate physical characteristics of the LPTs."  *See* Resp. of HHI to Section D of the Questionnaire (Feb. 5, 2016) ("HHI's Sec. D Resp.") at D-2, CJA Vol. V Tab 22, CR 163-69, PJA Vol. I Tab 22, PR 97, ECF No. 45-1.  Commerce found that despite the

agency's clear instructions, HHI failed to report correctly its home-market price because

it excluded a certain part from the home-market gross unit price, thereby understating

normal value.  *See* I&D Mem. at 23-25.

In a supplemental questionnaire, Commerce instructed HHI to provide complete

sales documentation and all sales related documentation for two home-market sales.[9]

July 27, 2016 Suppl. Questionnaire at 5.  The documentation that Plaintiff submitted in

response indicated that HHI "incorrectly identified a certain part required to assemble a

complete LPT as non-foreign like product."  I&D Mem. at 24 & n.123 (citing HHI's Aug.

18, 2016 Suppl. Resp. at 1-3 & Attach. 2S-17).[10]

Commerce issued a second supplemental questionnaire, requesting documents

supporting HHI's sales negotiation process and all expenses concerning these same

home-market sales.  Oct. 7, 2016 Suppl. Questionnaire at 5.  Hyundai again reported

the same part as non-subject merchandise.  *See* Resp. to the Third Suppl. Sections A,

B, C, and D Questionnaire (Oct. 27, 2016), Attach. 3S-7 at JA 300104-JA 300106, CJA

Vol. VI Tab 7, CR 347-71, PJA Vol. II Tab 7, PR 225-27, ECF No. 46-1.

In December 2016, ABB raised the issue of HHI's failure to include the part in the

home-market gross unit price in comments to the agency.  *See* ABB's Dec. 2, 2016

Cmts at 10-13.  In its response to these comments, HHI failed to address this issue;

---

[9] Home market sequence numbers 84 and 91.  July 27, 2016 Suppl. Questionnaire at 5.
[10] HHI reported the local control panels for main transformers (MT), stand-by auxiliary transformers (SAT), and unit auxiliary transformers (UAT) as non-subject merchandise. *See* HHI's Aug. 18, 2016 Suppl. Resp., Attach. 2S-17 at JA100160, JA100165-JA100167 (referring to this part as "NSM").

instead, it waited to raise the issue in its case brief.  *See* Def.'s Resp. at 22; Pl.'s Br. at

13.  In its case brief, HHI then argued:

> At this stage of this review, [HHI] is not permitted to submit rebuttal
> information to respond to ABB's argument and is limited to documents on
> record.  With this limitation, the record is ambiguous and does not allow a
> definitive conclusion regarding whether the items in question are properly
> included in the gross unit price.

Pl.'s Br. at 13 (quoting HHI Admin. Case Br. (Jan. 5, 2017) at 21, CJA Vol. V Tab 19,

CR 462, PJA Vol I Tab 19, PR 279, ECF. No. 45-1).  Hyundai proffered a "revised price

calculation worksheet" that allegedly included the excluded part with increased gross

unit prices for the sales in question.  Pl.'s Br. at 13; HHI Admin. Case Br. at 21 & Ex. 2.

Commerce concluded that the excluded part was "required to assemble a

complete LPT," and that Hyundai had incorrectly labeled the part as non-subject

merchandise in its first and second supplemental questionnaire responses.  I&D Mem.

at 25.  The agency noted while HHI excluded the part from the gross unit prices for the

home market sales, it included the same part in the gross unit prices for the U.S. sales,

rendering the two prices incomparable.  *Id.*  Because this issue impacted the vast

majority of home market sales for which the agency had examined full documentation,

Commerce found that the improper reporting called into question all of the home market

sales reporting and, thus, found all of HHI's home market prices unreliable.  *Id.* at 26.

### b.  Parties' Contentions

At the outset, Plaintiff does not specifically challenge Commerce's factual finding

that that the excluded part was subject merchandise and Plaintiff failed to correctly

report it as such.  *See* Pl.'s Br. at 34-35.  Instead, Plaintiff argues that the sales

documentation and revised calculation it provided to the agency as part of its

administrative case brief contained all the information necessary to calculate home

market prices for the LPTs, inclusive of the part.  *See* Pl.'s Br. at 34. [11]  Plaintiff avers

that "[Commerce] had no grounds to use [facts available]" under these circumstances.

Pl.'s Br. at 34.

Defendant argues that HHI's failure to include the particular part in its home-

market gross unit price "undermined Commerce's ability to analyze [HHI]'s information"

and "Commerce reasonably determined that Hyundai failed to act to the best of its

ability to provide necessary requested information."  Def.'s Resp. at 19-20.  ABB argues

that HHI is attempting to shift the record-building burden to Commerce by "claiming that

this issue did not arise until late in the proceeding such that HHI was deprived of the

chance to remedy its misreporting," when the burden to build the record is on the

respondent.  ABB's Resp. at 36-37.

### c.  Analysis

Commerce's finding that HHI's failure to report properly its home market sales,

inclusive of the price of within-scope parts, warrants the use of adverse facts available

is supported by substantial evidence.

First, as noted, Plaintiff does not directly challenge Commerce's factual finding

that Plaintiff withheld information, such as the proper reporting of the part in question.

Second, Commerce identified the problem with HHI's reporting while in the process of

---

[11] The sales documentation included product price and detail for the part in question.
*See* HHI's Aug. 18, 2016 Suppl. Resp., Attach 2S-17 at JA100164-JA100168.

reviewing Plaintiff's response to the second supplemental questionnaire, I&D Mem. at

24, and HHI acknowledged that this issue was identified at  "a very late stage of the

review process," *id.*  Plaintiff does not argue that Commerce should have provided it an

opportunity to remedy its defect, but argues that Commence should have utilized the

revised calculation worksheet that HHI submitted in its administrative case brief.  *See*

Pl.'s Br. at 34.  Alternatively, Plaintiff argues that Commerce had the necessary

documentation to calculate the prices inclusive of the part.  *Id.*  This argument requires

the court to assess whether substantial evidence supports a finding that HHI failed to

satisfy the elements of 19 U.S.C. § 1677m(e) regarding the use of certain information.

Commerce declined to rely on the revised calculated worksheet because it "did

not have time to confirm or verify the validity of these revisions."  I&D Mem. at 25

(discussing in detail the agency's concerns with HHI's reporting and providing specific

examples of why it questioned the reliability of HHI's reported home market prices). As

discussed above, § 1677m(e) precludes Commerce from disregarding information that

is "necessary to the determination" when five criteria are satisfied.  19 U.S.C.

§ 1677m(e).  Having articulated its reasons for why it could not verify the accuracy of

this data, 19 U.S.C. § 1677m(e) did not preclude Commerce from disregarding this

data.

Finally, the court must assess whether Commerce's analysis of HHI's mis-

reporting of this part supports its determination to draw an adverse inference pursuant

to 19 U.S.C. § 1677e(b).  "'Compliance with the 'best of its ability standard . . . requires

that importers . . . have familiarity with all of the records . . . [in their] possession,

custody, or control," and that they "conduct prompt, careful, and comprehensive

investigations of all relevant records that refer or relate to the imports in question to the

full extent of the importers' ability to do so." *Nippon Steel Corp.*, 337 F.3d at 1382.

Here, the court cannot find fault with the agency's conclusion that this issue supports

the use of an adverse inference.  Record evidence indicates that Plaintiff understood it

was required to report the gross unit price to reflect any parts necessary to assemble an

incomplete LPT.  As Commerce noted, the same part that Plaintiff reported as non-

subject merchandise in its home-market sales database was also sold in the United

States and properly reported as subject merchandise in the U.S. sales database.  *See*

I&D Mem. at 25 & n.134 (citing HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-35).  At no

point in its briefing to the court, including in its reply brief after Defendant and

Defendant-Intervenor raised this issue, did Plaintiff acknowledge or address this

contradictory treatment of the part in question.  *See* Def.'s Resp. at 24; ABB's Resp. at

36.  On this record, it is clear that HHI failed to act to the best of its ability in properly

reporting sales of this part.

## III.   Accessories

### a.  Relevant Facts

As previously noted, Commerce instructed HHI to "separately report the price

and cost for 'spare parts' and 'accessories' to ensure that product matches are based

on accurate physical characteristics of the LPTs."  HHI's Sec. D Resp. at D-2.

Commerce, however, did not define what it meant by "accessories."  *See id.*  In its

response, HHI reported the price and cost for "spare parts," that is, "parts that are not

needed to assemble an incomplete [LPT,] and noted that "there is no definition of what

constitutes 'accessories.'"  *Id.*  HHI further stated that components attached to the active

part of the LPT are defined as included within the subject merchandise; therefore, it

reported the price and cost of those components inclusive with the LPT.  *Id.* at D-2—D-

3.

　　　Commerce sent a supplemental questionnaire requesting HHI to "confirm that

[its] product-specific costs do not include the costs for spare parts and accessories (i.e.,

non-subject merchandise)."  *See* Resp. to the Third Suppl. Sections A, B, C, and D

Questionnaire (Oct. 27, 2016) ("HHI's Oct. 27, 2016 Suppl. Resp.") at 22, CJA Vol. V

Tab 24, CR 349-67, PR 225-27, ECF No. 45-1.  In its response, HHI "confirm[ed] that

the product-specific costs reported in the cost database do not include costs for non-

subject merchandise."  *Id.*  In the *Final Results*, Commerce concluded that "[HHI]

withheld necessary information that was specifically requested" with respect to

"accessories."  I&D Mem. at 27.  It reasoned that if HHI "had questions related to the

definition of 'accessories,' it could have contacted the [agency] to request clarification."

*Id.*  Moreover, it found that record evidence, to wit, sales documentation, contradicted

HHI's assertion that it was unaware of the definition of accessories "because sales

documentation provided by [HHI] indicates that the industry uses such term and that

term is referred to in certain documents provided by [HHI]."  *Id.* at 27 & n.139 (citing

HHI's Nov. 10, 2016 Resp., Attach. 3S-35).

### b. Parties' Contentions

Plaintiff argues that Commerce was responsible for defining "accessories," Pl.'s

Br. at 38, and states that the documents referenced by the agency did not consistently

treat particular products as "accessories," which "demonstrates [HHI's] quandary and

why [Commerce] needed to define 'accessories,'" Pl.'s Reply at 17.  Plaintiff also argues

that the agency failed to comply with 19 U.S.C. § 1677m(d); that is, to notify HHI of the

deficiency and provide it an opportunity to cure the deficiency.  *See* Pl.'s Reply at 15-16.

Defendant and ABB argue that Commerce did not have the burden to define

"accessories" because the burden to build the record is on the respondent; HHI did not

request clarification regarding the definition of "accessories"; and HHI knew the

definition of "accessories" because its sales documentation uses the term.  *See* Def.'s

Resp. at 27; ABB's Resp. at 40.

### c. Analysis

Commerce's conclusion that "[HHI] withheld necessary information that was

specifically requested" with respect to "accessories[,]" I&D Mem. at 27, is unsupported

by substantial evidence.  Commerce asserted that it instructed HHI to separately report

accessories, and HHI failed to do so.  *See* I&D Mem. at 26-27; *see also* Def.'s Resp. at

26-27.  However, Commerce did not find that any of HHI's components should have

been reported as accessories.  *See* I&D Mem. at 26-27.  Plaintiff asserted that "all of its

'accessories' are in the scope by definition, and, thus properly included in subject

merchandise[.]"  *Id.* at 26.  Commerce made no finding that Plaintiff's assertion was

incorrect.  *Id.* at 26-27.  Rather, it appears that the agency faulted HHI simply for

asserting that it was unaware of how Commerce defined accessories (because

Commerce never provided guidance on this definition), rather than for failure to correctly

report accessories.  Specifically, Commerce stated:

> [R]ecord evidence contradicts [HHI's] assertion that [HHI] has been
> unaware of the definition of accessories. Specifically, at minimum, [HHI] is
> aware of what constitutes an accessory, because sales documentation
> provided by [HHI] indicates that the industry uses such term and that term
> is referred to in certain documents provided by [HHI].

*Id.* at 27 & n.139 (citing HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-35).  Commerce

never made a factual finding that any "accessories" referenced in such sales

documentation were non-subject merchandise that should have been separately

reported as accessories.  *Id.* at 26-27.

HHI addressed its concerns regarding a lack of definition for accessories in

written submissions before and after Commerce issued the questionnaires requesting

this data.   *See* Resp. to Petitioner's Comments on Antidumping Questionnaires (Nov.

20, 2015) at 3-4, CJA Vol. V, Tab 21, PJA Vol. V Tab 21, PR 19, ECF No. 45-1;

Rebuttal Br. of Hyundai Heavy Industries Co., Ltd. (Jan. 11, 2017) at 66, CJA Vol. V,

Tab 25, CR 469, PJA Vol. I Tab 25, PR 288, ECF No. 45-1 (arguing that "[b]y definition,

[accessories] are subject merchandise and properly included in the transformer" and

that "ABB has not demonstrated that any of the "accessories" of which it complains is

not attached to, has a function in, or is integral to the transformer").  Additionally,

documentation on record shows that there has not been consistent identification of

"accessories," which supports the need for guidance on the term's meaning.  *See* Pl.'s

Reply at 17.[12]  Without guidance from Commerce regarding the definition of

"accessories," HHI's interpretation of the term as excluding transformer parts that

physically attach to an LPT was reasonable and otherwise appears to comport with the

scope of the order and with Commerce's instructions.  *See* Initial Questionnaire at

JA100062 (defining the scope of subject merchandise as "consisting of the active part

and any other parts attached to, imported with or invoiced with the active parts of

LPTs"); HHI's Oct. 27, 2016 Suppl. Resp. at 22 ("[C]onfirm that your product-specific

costs do not include the costs for spare parts and accessories (i.e., non-subject

merchandise).").

ABB argues that "Commerce was not in a position to define accessories as the

term applies to HHI's sales without HHI providing information on how that term was

used [with its customers]" and that "it was incumbent on HHI in the first instance to

notify Commerce of its commercial practice regarding the treatment of accessories."

ABB's Resp. at 40 (first alteration in original).  However, Commerce did not

communicate to HHI that its commercial literature should be the basis of the

"accessories" definition.  The only guidance Commerce provided to HHI regarding the

---

[12] *Compare* HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-35 at JA100587-92, CJA Vol. II Tab 17, ECF No. 41-1 (listing "Transformer Monitoring," "On-line Dissolved Gas & Moisture Monitor," "Magnetic Liquid-Level Indicators," "Pressure-Relief Devices," "Rate-of-Rise Fault Pressure Relay," "Bladder Integrity Relay," "Dial-Type Top-Oil Thermometer," "Dial-Type Winding Thermometer," and "Transformer Nameplate" as "accessories"), *with id.* at JA 101002-09 (listing "Fault Gas Analyzer," "LAN Ethernet Switch," "Fiber Optic Temperature Monitoring/Control & Sensors," "Top Oil/Winding Temperature Instrument," "Thermometers," "Fan And Oil Pump Motors," "Oil Level Sight Glass," "Buchholz Relay," "Fault Pressure Relay," "Seal-In Relay," "Rupture Disk Assembly Failure Relay," "Auxiliary Relays," "Alarm Contacts," "Tap-Changer Operator," "Identification Plates," and "Valves" as "accessories").

definition was in the scope of the order and when Commerce compared "accessories" to

non-subject merchandise in the second supplemental questionnaire.  "If Commerce is to

take an action adverse to a party for an alleged failure to comply with an information

request, it must fulfill its own responsibility to communicate its intent in that request."

*Prosperity Tieh Enter. Co. v. United States*, 42 CIT ___, 284 F. Supp. 3d 1364, 1381

(2018).

For the foregoing reasons, Commerce's conclusion that "[HHI] withheld

necessary information that was specifically requested" with respect to "accessories" is

unsupported by substantial evidence.

## IV.    Selective Reporting and Other Discrepancies

### a. Relevant Facts

In October 2016, Commerce instructed Hyundai to "provide complete sales and

expenses documentation (including all sales and expenses related documentation

generated in the sales process) for all U.S. [sales]."  Oct. 7, 2016 Suppl. Questionnaire

at 5 (emphasis omitted).  Hyundai responded by providing, *inter alia*, an attachment

comprised of over 3,300 pages of sales information.  *See* HHI's Nov. 10, 2016 Suppl.

Resp., Attach. 3S-35; *supra* note 7

In the *Final Results*, Commerce determined that HHI selectively reported

information in response to Commerce's October 2016 request, and that there were

other discrepancies with this submission that further supported use of adverse facts

available.  *See* I&D Mem. at 27-28.  Commerce found that HHI impeded the review and

frustrated the agency's ability to "satisfy [itself] that the data provided are accurate and

reliable." I&D Mem. at 27.  As an example of HHI's selective reporting, Commerce

stated it was missing invoices for certain expenses despite its instruction to HHI "to

submit all related documents."  I&D Mem. at 28.  Commerce also identified

discrepancies in freight and marine insurance values reported to U.S. Customs and

Border Protection and to Commerce, brokerage expense issues, and an incorrect

allocation of installation costs.  *See* I&D Mem. at 28.

### b.  Parties' Contentions

Plaintiff argues that Commerce's determination lacks specific explanation to

support its findings that HHI selectively reported information and that there were

discrepancies in the information that HHI provided.  *See* Pl.'s Br. at 39-40.  Plaintiff also

asserts that Commerce's "request for all U.S. sales and expense documents late in the

case was procedurally unfair" because it "denied [HHI] an opportunity to clarify data by

prohibiting the submission of new facts."  *Id.* at 40-41.  Defendant contends that HHI

failed to cooperate to the best of its ability because it did not comply with Commerce's

request for complete sales and expense documentation, namely, by failing to provide

invoices.  *See* Def.'s Resp. at 30-31.  Defendant further contends that HHI could not

rely on Commerce's acceptance of information in the *Preliminary Results* when

Commerce requested additional supporting information after the *Preliminary Results*.

*Id.* at 31.  ABB avers that Commerce did identify specific deficiencies in the *Final*

*Results*, and Commerce's findings are supported by substantial evidence.  *See* ABB's

Resp. at 42-43 (citing I&D Mem. at 27-28).  According to ABB, HHI's selective reporting

and discrepancies in its data amounts to "willful behavior that does not meet the

'maximum effort' standard set in *Nippon Steel*."  *Id.* at 43 (citing *Nippon Steel,* 337 F.3d

at 1382).

### c.  Analysis

Commerce's determination that Hyundai impeded the review by selectively

reporting incomplete and unreliable documentation to Commerce is unsupported by

substantial evidence.  "Substantial evidence is 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp.*

*v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v.*

*NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).  To be supported by

substantial evidence, Commerce must explain the basis for its decisions sufficiently to

make its decisions reasonably discernable to a reviewing court.  *NMB Singapore Ltd. v.*

*United States*, 557 F3d. 1316, 1319 (Fed. Cir. 2009) (citing *NSK Ltd. v. United States*,

481 F.3d 1355, 1359 (Fed. Cir. 2007)).

Commerce's discussion of HHI's selective reporting and data discrepancies lacks

record citations supporting the agency's findings.  *See* I&D Mem. at 27-28 & nn.140-41

(citing only the Oct. 7, 2016 Suppl. Questionnaire at 5-6).  Commerce's discussion

consists of conclusory statements regarding HHI's 3,300 pages of sales documentation,

without any examples or citations to support those statements.  *See id.* at 27-28.  As a

result, the court cannot reasonably discern how HHI impeded the review because the

court cannot determine which transactions were missing supporting documentation, and

which particular information Commerce determined was missing when it concluded that

HHI's submission was deficient.

For example, Commerce found that Hyundai "did not provide invoices for many expenses." *Id.* at 28.  The only record evidence that the agency cited as support is Commerce's supplemental questionnaire dated October 7, 2016.  *See id.* at 27-28 nn.140-41 (citing Oct. 7, 2016 Suppl. Questionnaire at 5-6).  The questionnaire does not indicate that HHI failed to provide any invoices because it does not include HHI's responses or identify particular transactions that were not supported by invoices. Commerce also found "other discrepancies on the record" for which it provided no citations to the record or detailed discussion.  *See id.* at 28.  The Government cites generally to the extensive attachment and does not explain how the agency determined that the attachment indicates which invoices were missing or otherwise demonstrates discrepancies in HHI's data.  *See* Def.'s Resp. at 30 (citing HHI's Nov. 10, 2016 Suppl. Resp., Attach. 3S-35).

ABB cites its own administrative case brief as record evidence supporting the agency's findings.  ABB's Resp. at 42 & nn. 11-12 (citations omitted).  However, the Issues and Decision Memorandum does not indicate that Commerce relied on ABB's administrative case brief to determine that there was missing documentation or that Commerce agreed with the discrepancies alleged therein.  *See* I&D Mem. at 27-28 & nn.140-41.  The court may not conclude that Commerce based its findings on ABB's administrative case brief when Commerce made no indication of such in the Issues and Decisions Memorandum.  "Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."  *NMB Singapore Ltd.*, 557 F.3d at 1319.

Commerce's Issues and Decision Memorandum, by itself, does not constitute

substantial evidence.  In the absence of substantial evidence, this conclusion must be

remanded.  *See Bowman Transp., Inc. v. Ark.–Best Freight System, Inc.*, 419 U.S. 281,

285-86 (1974) ("The agency must articulate a rational connection between the facts

found and the choice made.") (internal quotation marks and citation omitted).

## CONCLUSION

As previously noted, Commerce based its decision to use total facts available

with an adverse inference on four findings: (1) HHI failed to report separately service-

related revenues despite repeated requests from Commerce; (2) HHI failed to include

the price of a subject part in the gross unit price of certain home-market sales; (3) HHI

failed to report separately the price and costs of accessories; and (4) HHI selectively

provided (and withheld) sales documents, and there were discrepancies in the

reporting.  The court has found that two of the four bases for resorting to total adverse

facts available were unsupported by substantial evidence; therefore, the court will

remand this matter to the agency so that Commerce may reconsider or further explain

its decision to use total facts available with an adverse inference.[13]

In accordance with the foregoing, it is hereby

---

[13] At Oral Argument, Defendant and Defendant-Intervenor both suggested that any one or two of the bases cited by Commerce was sufficient to support the agency's decision to rely on total adverse facts available in the *Final Results*.  *See* Oral Arg. Tr. at 15-20, ECF No. 51.  While the court finds that two of the four bases are supported by substantial evidence, the court is unable to affirm the agency's resort to total adverse facts available because the agency made clear that its determination was based on its view of the record "taken as [a] whole."  I&D Memo. at 17.

**ORDERED** that Commerce's *Final Results* are remanded to Commerce so that it may reconsider or further explain its use of total facts available with an adverse inference consistent with this Opinion;

**ORDERED** that Commerce shall file its remand results on or before November 13, 2018; and it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words.

/s/    Mark A. Barnett
Mark A. Barnett, Judge

Dated:  August 14, 2018
New York, New York